UNITED STATES v. THOMPSON. See Case No. 14,820.

UNITED STATES (THOMSON v.). See Case No. 13,985.

---

## Case No. 16,493.

UNITED STATES v. THORN et al.

[9 Int. Rev. Rec. 65; 2 Am. Law T. Rep. U. S. Cts. 43.]

District Court, D. New Jersey. Feb. 15, 1869.

INTERNAL REVENUE—NEGLIGENCE OF COLLECTOR —ACTION ON BOND.

[In an action on a collector's bond, on account of his breach of duty in allowing spirits to be removed from a warehouse without the furnishing of proper bonds, it is no defense that he had no corrupt purpose, but was merely careless.]

This action was brought against ex-collector of internal revenue, George W. Thorn, of the Fifth district of New Jersey, and the sureties upon his official bonds for a breach thereof.

A. Q. Keasbey, U. S. Dist. Atty., and Mr. Young, Asst. Dist. Atty.

Ex-Chancellor Williamson and Isaac W. Scudder, for the defence.

FIELD, District Judge (charging jury). This is an action upon the official bond of George W. Thorn, late collector of internal revenue for the Fifth district of New Jersey. The condition of the bond is, "that if the said George W. Thorn, shall truly and faithfully execute and discharge all the duties of the said office according to law, and shall justly and faithfully account for, and pay over, to the United States, in compliance with the orders and regulations of the secretary of the treasury, all public monies which may come into his hands or possession; and if each and every deputy collector, appointed by said collector, shall truly and faithfully execute and discharge all the duties of such deputy collector according to law, then the said obligation to be void."

This condition, you will perceive, is threefold: First, that George W. Thorn shall faithfully discharge the duties of his office. Second, that he shall pay over to the United States all public monies received by him. Third, that any deputy collector he may appoint, shall faithfully discharge the duties of such deputy collector. It is not charged that there has been any breach of the two last-named conditions, and these may therefore be left entirely out of view. It is the first condition of the bond only, which is alleged to have been violated. But it would not have been enough to have alleged generally, that he had failed to perform all the duties of his office. It was necessary to go further; and state what were the specific duties which he had failed to discharge. The declaration, therefore, goes on to say, that by the provisions of an act of congress, approved June 30, 1864 [13 Stat. 223], and the rules and regulations made in pursuance of them by the secretary of the treasury, it was made the duty of the said collector, upon the receipt of an application for a permit, to transport any distilled spirits from a bonded warehouse in his district to a bonded warehouse in another district, to exact from the applicant a transportation bond, with good and sufficient sureties, in at least double the amount of the taxes imposed thereon; and that, in violation of this duty, the said collector did permit large quantities of distilled spirits, amounting in the whole to fifty thousand gallons, to be removed from certain bonded warehouses in his district, to a bonded warehouse in San Francisco, California, without exacting bonds with good and sufficient sureties, as required by law; and so, it is said, the said George W. Thorn, did not truly and faithfully execute and discharge the duties of his office, but wholly failed and neglected so to do. These are the material allegations contained in the declaration, and they indicate the nature of the issue which you have been sworn to try.

On the first day of November, 1866, George W. Thorn was appointed collector of the Fifth district of New Jersey. It was by far the most important revenue district in the state, and one of the most important in the United States. Some idea of its importance may be gathered from the fact, stated by Mr. Thorn himself, that during the few months he was in office, the receipts amounted to about a million of dollars. It was a district of which New Jersey was proud. There was not another district in the whole country, for which the revenue had been more faithfully collected. Such was its character before Mr. Thorn was appointed collector. Such, I am glad to say, is its character now.

It was by the 61st section of the act of June 30, 1864, and the rules and regulations made in pursuance thereof, that distilled spirits were allowed to be removed from one bonded warehouse to another. It was an unfortunate provision, and proved to be a most prolific source of fraud. But before such removal could be made, a transportation bond was required to be taken, with good and sufficient sureties, in at least double the amount of the duties imposed upon such distilled spirits. When Mr. Thorn, therefore, entered upon the duties of his office, he must have known that one of the most important and responsible of those duties would be in connection with these transportation bonds. It was a duty, which required for its faithful performance, the exercise of the utmost care, caution, diligence and vigilance. It was not a mere clerical duty; it was a duty to be performed, not so much in the office as out of it. It was a duty which could only be performed by the collector himself, or by a trusted and experienced deputy, for whose acts he was responsible. Of all duties it was the one which could not properly be entrusted to a mere subordinate. The counsel for the defendants have said it was a new duty never before imposed upon collectors of internal revenue; a device by whiskey dealers, now contrived for the first time; a snare, recently sprung, into which any man might fall unawares. It was not so. The law regarding transportation bonds had been passed in June, 1864. The rules and regulations concerning them had been promulgated in May, 1865. The whole country was ringing with rumors of frauds upon the revenue, growing out of these very transportation bonds. It seems almost impossible that Mr. Thorn could have been unaware of these facts. His attention, indeed, was particularly called to the subject by Mr. Wallace, his predecessor in office. Mr. Thorn had been, for two years, storekeeper under Wallace. In this capacity he had become familiar with warehouse bonds. Mr. Wallace now called his attention to the difference between warehouse bonds and transportation bonds, and how much more necessary it was to exercise vigilance about the one than the other. He cautioned him about taking transportation bonds. He said to him, that in taking ware-

house bonds, less care was required because he had the goods in his possession, but in taking transportation bonds it was necessary to use the utmost scrutiny, because he parted with the possession of the goods, and had nothing but the bonds to rely upon. Thus forewarned, what did Mr. Thorn do? On the 14th of January, 1867, 148 barrels of whiskey were removed from a warehouse in New York to one in Jersey City, and he was applied to for a permit to have it transported to San Francisco. It was the first transaction of the kind in his office. Every circumstance connected with it was calculated to awaken distrust and excite suspicion. It was the first time that whiskey had ever been removed from a bonded warehouse in New York to one in Jersey City. Such was the reputation previously sustained by the revenue officers in our state, that a bonded warehouse in New Jersey was the very last place where a dealer in whiskey, who meditated a fraud, would have cared to have it stored. But again, if it were really intended to be transported to California, why bring it over to New Jersey? There were no steamers or packets running from Jersey City to San Francisco, and it would therefore have to be taken back to New York again in order to reach its destination. A moment's reflection would have satisfied any one that some fraud was intended. It was impossible to reconcile such conduct with any honest purpose. But why ask for a permit to transport it to California? The motive was obvious. If transported to any other district than one on the Pacific coast, only two months would have been allowed by law, in which to complete the transportation. But if transported to California, six months were given. To this add the thirty days in which to produce the certificate of its receipt at San Francisco, and seven months must necessarily elapse before the fraud could be detected.

With everything, therefore, to awaken suspicion, let us see what was the course pursued by Mr. Thorn when this first bond was presented. Gardiner, the bond clerk, says the first time he saw it, it was lying on Mr. Thorn's table. A man was sitting there, who he thought had brought it. Thorn asked him to look at it and see if it was all right. Did he ask him if he knew the parties who had signed it, and if they were responsible men? If he had, Gardiner would have told him that he knew nothing about them. But he simply asked him if it was all right. Gardiner looked at the bond, and said the residences of none of the parties were given, and it was not justified. The man who was sitting there observed they were from New York. Gardiner said, the spaces in the bond were large enough, and their residences had better be put in. The man said he would have it attended to. The next day Gardiner saw the bond on his table, and

again called Mr. Thorn's attention to the fact that the residences had not yet been put in. Thorn said the parties had promised to have it done. Gardiner thereupon endorsed the bond and filed it away. That was bond No. 1. Bond No. 2 bears date January 22d, about one week afterwards. The principal on the bond was different, but the sureties were the same as on the former one—H. Wilkins and E. Behn. Not only were their residences not inserted, but their full names were not given. Gardiner found this bond on his table. It had been laid there while he was at dinner. He told Mr. Thorn there was the same objection to this as the former one—the residences were not given. Thorn made the same answer he had done before—the parties had promised to attend to it. The 3d bond is dated January 31st. There were 100 barrels of whiskey, and the amount of the bond was $23,000. The 4th bond was dated February 7th—195 barrels, and the amount of the bond, $42,000. The 5th bond bears date March 2d, two days before Mr. Thorn's term of office expired—the senate not having confirmed his nomination. The quantity of whiskey removed was 500 barrels, and the amount of the bond $110,000. All of these bonds Gardiner found upon his table. Who put them there he did not know. He never inquired about them. All he had to do was to file them away, and record them. Thus, between the 14th of January and the 2d of March, permits were granted by Mr. Thorn for the removal, from Jersey City to San Francisco, of nearly 1,000 barrels of whiskey, the duty upon which amounted to $107,000. Well, of course, the whiskey was taken over to New York and then sold. Nobody in his senses, ever supposed that it was intended to transport it to California. When the time had elapsed when the certificate of its arrival at San Francisco ought to have been received, the bonds were put into the hands of the district attorney to collect. Process was issued, and delivered to Deputy Marshal Benjamin. He went to Jersey City, and enquired of every one who was likely to know any thing of the parties to these bonds. Nobody had ever heard of them, or knew anything about them. He then went to Mr. Thorn and asked him if he could give him any information with regard to them. According to the testimony of Benjamin, Mr. Thorn said, "I don't know the principals; I don't know the sureties; I don't know the witnesses; and, Benjamin, I don't know how I came by them." This, of course, was the last of these bonds. Nothing was ever collected upon them. They were perfectly worthless.

Such is the case made out by the United States. Now what is the evidence on the part of the defendants? Mr. Thorn has been called as a witness, and examined at great length. What account does he give of these

transactions? He really does not seem to have any recollection whatever with regard to these bonds. He does not remember having any conversation with Gardiner in reference to them. He don't know who put them on Gardiner's table. All he can say about them is, "Mr. Gardiner had charge of the bond account. He looked after the securities on the bonds, and their sufficiency. I looked to him for that." And again he says, "I relied wholly upon Mr. Gardiner. I took no personal responsibility as to these bonds." This, then, is the defence. It was the duty of Gardiner to see that the sureties on transportation bonds were good and sufficient, and if he failed to perform this duty, Mr. Thorn was not responsible. It is difficult to treat such a defence seriously. In the first place, was this the duty of Gardiner? He had been bond clerk under Mr. Wallace, the former collector, and it was no part of his duty then. But it is said, his salary was increased when Mr. Thorn employed him, and hence it may be inferred, that some additional duties were to be performed by him. Did Mr. Gardiner understand that this was to be one of his duties, that he was expected to look after the sufficiency of, the sureties on transportation bonds? He tells you expressly that he did not, and that Mr. Thorn never informed him that this was any part of his duty. And what is more remarkable still, he says, that permits had actually been given out to the parties, before the bonds ever came into his hands. So that, even if it had been any part of his duty to enquire into the sufficiency of the sureties, it was then too late. What does Mr. Thorn say with regard to this matter? He frankly admits, "that he never gave any particular instructions to Gardiner." Did he even give him any instructions at all? Did he ever give him the slightest intimation that this was one of his duties? He does not pretend that he ever did. But it is insisted, that when the first bond was handed to Gardiner, Thorn asked him, "if it was all right." Great stress is laid by counsel on the use of the words "all right," and it is argued, that by this he must have meant to enquire whether the sureties were sufficient, for if they were not sufficient, it would not have been all right. But how could Gardiner, by merely looking at the bond, judge of the sufficiency of the sureties? If he had been asked, whether he knew the sureties, and whether, in his opinion, they were responsible men, then the case would have been different. It is, I think, very manifest that all that Mr. Thorn meant to ask was, whether the bonds were in proper form. And so Gardiner evidently regarded it. And with respect to the other bonds, no question whatever was asked of Gardiner. He found them lying upon his table —he did not know who put them there—the permits had already been granted—and all he had to do was to file and record them.

But it is said that Mr. Thorn was oppressed by the multiplicity of his duties, and had really no time to look after these bonds. But he was not without valuable assistants. He had a cashier, who also acted as a deputy; he had a chief clerk; he had an abstract clerk; he had a copying clerk, and he had a bond clerk. These were all experienced men, and had been in the employment of his predecessor. What remained for Mr. Thorn to do? He says, he "answered letters, gave information to those who wanted it, and had a general superintendence." There was one duty, however, more important than all others. One of the chief sources of revenue relied upon by government was the tax upon distilled spirits. It was here that the most extensive frauds had been committed— frauds in connection · with transportation bonds. This, then, the most important of all his duties, he left entirely with his bond-clerk, a young man under age, without ever informing him that this was his duty, and without ever seeing that he performed it. It is for you, gentlemen, to say whether this was a faithful execution of the duties of his office. If you are satisfied it was not, it is your duty to find a verdict for the government.

But it is said there is no evidence of corruption on the part of Mr. Thorn, or of any dishonest purpose. It is conceded that he was careless, and may have acted under a mistaken sense of duty. But this is no defence. What his motives were we do not know. We can not look into his heart. All I can say is, that if his purposes were honest and right, it is difficult to account for his conduct. This is a case of much importance. It is the first instance, so far as I know, that an action has been brought upon the official bond of a collector of internal revenue. It may be drawn into a precedent in future cases. It is important to know whether such a bond is a mere form, or whether those who become sureties upon it, assume to themselves a grave and serious responsibility. A touching appeal has been made to your sympathy. There is a power which may grant pardons and remit penalties; but we have a sterner duty to perform. We sit here to administer justice, not exercise mercy. We must decide according to the law and the evidence. If you find for the United States, you must assess the damages. The measure of these damages, is the loss sustained by reason of the taking of these worthless bonds. But the penalty of the bond is $100,000, and in assessing the damages you cannot go beyond this amount.

A verdict was rendered in favor of the United States, and the damages were assessed at $100,000.